

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| MAX GROSSMAN, | § | No. 08-19-00272-CV |
| | | |
| Appellant/Cross-Appellee, | § | Appeal from the |
| | | |
| v. | § | 384th District Court |
| | | |
| CITY OF EL PASO, | § | of El Paso County, Texas |
| | | |
| Appellee/Cross-Appellant. | § | (TC# 2017-DCV2528) |

**O P I N I O N**

By enacting the Antiquities Code of Texas (the Code), Chapter 191 of the Texas Natural Resources Act, the Legislature declared it the public policy of the State of Texas, and in its public interest, to locate, protect, and preserve, "all sites, objects, buildings, pre-twentieth century shipwrecks, and locations of historical, archeological, educational, or scientific interest," within the jurisdiction of the State.[1] And, such preservation interest extends to "prehistoric and historical American Indian or aboriginal campsites, dwellings, and habitation sites," or objects related thereto, which are located in, on, or under any land in the State.[2] To effectuate this policy and state

---

[1] *See* TEX. NAT. RES. CODE ANN. §§ 191.001-.174; *see id.* § 191.001 (chapter may be cited as the Antiquities Code of Texas); *see also id.* § 191.002.

[2] *See id.* § 191.002.

interest, the Code further provides that citizens of Texas may bring an action for injunctive relief to enjoin violations or threatened violations of provisions of the chapter.[3]

This case concerns such an action brought in the context of a plan by the City of El Paso to build a multipurpose facility in a downtown neighborhood, on city-owned land.[4] Appellant Max Grossman, a Texas resident and associate professor of art and architectural history at the University of Texas-El Paso, alleges the City is violating or threatening to violate provisions of the Code with regard to the archeological survey planned for the downtown project. Based on newly published research drawn from historic letters archived in Spain, Grossman learned of a Mescalero Apache peace camp existing, during the late 1700s, in the same area as the site now planned for the facility. By his live pleading, Grossman asserts the survey—in its current form—fails to properly account for the State's interest in locating, preserving, and protecting the archeological remains and resources of the newly identified peace camp. Seeking temporary injunctive relief to preserve the status quo and prevent a violation (or threatened violation) of the Code, Grossman alleges the City is obligated *not* to commence the project—including demolition of any currently existing buildings—until a valid archeological survey is completed. Without such relief, Grossman asserts the remains and resources of the historic peace camp will be lost forever. Because the City does

---

[3] *See id*. § 191.173.

[4] The underlying suit is one of two others brought in recent years over the City's downtown project. First, in *Ex parte City of El Paso*, 563 S.W.3d 517, 519 (Tex. App.—Austin 2018, pet. denied), the City preemptively filed a bond validation suit under Chapter 1205 of the Texas Government Code. *See generally* TEX. GOV'T CODE ANN. §§ 1205.001-.152 (titled "Public Security Declaratory Judgment Actions," but often referred to as the "Expedited Declaratory Judgments Act" or "EDJA"). Grossman, the appellant herein, appeared personally as an "interested party" in the EDJA suit along with other individuals who generally asserted the authorizing ordinance had limited the function of the facility as one for "performing arts," not for "sports," as was being proposed by the City. *Ex parte City of El Paso*, 563 S.W.3d at 521. Second, in *Grossman v. Wolfe*, 578 S.W.3d 250, 253-54 (Tex. App.—Austin 2019, pet. denied), Grossman also filed an *ultra vires* claim for injunctive relief against the Executive Director of the Texas Historical Commission asserting the Director had issued an archeological permit for the same downtown project without adhering to requirements of the Antiquities Code of Texas. *See* TEX. NAT. RES. CODE ANN. § 191.0525(c) ("If the committee determines that an archeological survey is necessary at the project location, the project may not commence until the archeological survey is completed."). The interplay of this appeal with these two cases is discussed in greater detail herein, where relevant.

not dispute the existence or location of the peace camp, or that the survey currently does not account for its existence, Grossman asserts the trial court abused its discretion in denying his application for a temporary injunction pending trial on the merits.

Opposing this claim, the City asserts several arguments. First, the City questions the need for any survey revisions arguing the research design and scope of work do recognize the potential for locating Native American artifacts in general. Second, the City argues that the Texas Historical Commission—as the supervising agency over the permit—requested no changes to the survey after Grossman himself informed the agency of the breakthrough discovery. Third, on legal grounds, the City asserts that Grossman's claim is barred by governmental immunity, or res judicata, or both. And, based on prior litigation involving the financing of the project, the City further asserts the claim will be dismissed due to a permanent injunction against the filing of any suits. Lastly, on equitable grounds, the City questions Grossman's motive, claiming he is principally interested in preserving the buildings of the construction footprint, not the potential remains of the historic peace camp.

Following an evidentiary hearing, the trial court denied the City's plea to the jurisdiction and Grossman's application for a temporary injunction. On interlocutory cross-appeal, the parties challenge both of those rulings. Because we conclude the primary objective of the Antiquities Code is to effectuate the State's interest in preserving archeological sites and objects—including historic American Indian campsites or dwellings—we affirm the denial of the plea to the jurisdiction. And because we further find the evidence established a right to preserve the status quo of the subject matter of the suit pending a trial on the merits, we reverse the trial court's order denying Grossman's request for a temporary injunction and remand the cause to the trial court with instructions that it grant the temporary injunction.

# I. BACKGROUND

At this time, the parties agree the City's planned project is located on *public land* and therefore subject to permit requirements set forth by the Antiquities Code of Texas. For context, we begin with a description of the project and the statutory framework governing the permit process. Following that description, we then turn to the factual and procedural background of the parties' dispute.

## A. The Project and its Location

To start, the City of El Paso adopted an ordinance for an election asking voters to authorize the issuance of bonds to finance several proposed projects within the city, including a multipurpose performing arts and entertainment center ("the MPC" or "the arena").[5] Based on the election held November 6, 2012, voters approved the issuance of bonds to finance the City's proposed projects. The City later identified a downtown site for the MPC and earmarked $180 million for that project. The City planned to construct the facility within an 11.6-acre tract of land roughly covering four city blocks. Those blocks are part of a city neighborhood now known as "Duranguito," but otherwise known in prior years as the "Union Plaza."

The area of Duranguito is bounded by Paisano Drive to the south, Santa Fe Street to the east, the convention center to the north, and the Union Depot to the west. It holds historic prominence as an original neighborhood of El Paso, or birthplace of the community. As a First Ward of the city, the Anson Mills Plat of 1859 named the streets of Duranguito for the stagecoach routes frequented by visitors and residents. San Francisco and San Antonio streets reflect East-

---

[5] The ordinance sought voter approval of general obligation bonds in the principal amount of slightly more than $228 million for "quality of life" projects, to include construction and renovation of new and existing facilities, that include certain museums, a Hispanic Cultural Center, a multipurpose performing arts and entertainment facility, and libraries. *See Ex parte City of El Paso*, 563 S.W.3d at 520.

4

West travel; while the streets of Santa Fe and Chihuahua account for the North-South route. Currently, the neighborhood is occupied by a mix of buildings—both business and residential—along with parking lots, streets, and alleyways. The City has acquired ownership of all properties needed to accommodate construction of the new project. It plans to demolish existing structures standing within the project's footprint.

### B. The Statutory Framework of the Antiquities Code

#### 1. The state's preservation interest

To effectuate the state's declared public policy, the Texas Historical Commission ("the THC") is charged with protecting and preserving the archeological and historical resources of Texas. *See* TEX. NAT. RES. CODE ANN §§ 191.051(b)(6) (general powers and duties); 191.003(1) ("Committee" defined as the "Texas Historical Commission"); 191.051(a) and (b) (the THC serves as "the legal custodian of all items described in this chapter that have been recovered and retained by the State of Texas"). Subchapter C of the Code details the powers and duties of the THC. *See generally id*. §§ 191.051-.059. Among prescribed duties, the THC determines the site and designation of state archeological landmarks; enters into contracts providing for discovery operations and scientific investigations; and considers requests for, and issues permits for, survey and discovery, excavation, restoration, demolition or study of sites and landmarks. *See id*. § 191.051(b)(2), (3) and (4); *see also id*. §§ 191.003(2) (defining "Landmark"); 191.053 (contract provisions); 191.054 (permit provisions); 191.052 (providing the THC may promulgate rules and otherwise require permit conditions).

#### 2. Requirements imposed on historically significant archeological sites

To effectuate THC supervision of protected state resources, the Code and rules adopted by the THC impose requirements on parties regarding certain projects. *See id.* §§ 191.0525-191.058; *see also* 13 TEX. ADMIN. CODE §§ 26.7(d)(1)-(4) (THC review of construction plans), 26.13-.18

(archeological permits). Before breaking ground at a project *on public land*, the person primarily responsible for the project or the person's agent must notify the THC. *See* TEX. NAT. RES. CODE ANN. § 191.0525(a). As relevant here, projects for a municipality require advance review "only if the project affects a cumulative area larger than five acres or disturbs a cumulative area of more than 5,000 cubic yards, whichever measure is triggered first, or if the project is inside a designated historic district or recorded archeological site." *Id*. § 191.0525(d).

Upon receiving notice of such a project, except in circumstances not applicable here, section 191.0525 provides that the THC shall promptly determine: (1) whether a historically significant archeological site is likely to be present at the project location; (2) whether additional action, if any, is needed to protect the site; and (3) whether an archeological survey is necessary. *Id.* § 191.0525(a)(1)-(3). When the THC determines a survey is necessary, section 191.0525 further provides, "the project may not commence until the archeological survey is completed." *Id*. § 191.0525(b).

If the THC determines that a survey is in the best interest of the State of Texas, the agency is empowered to issue a permit to other state agencies, political subdivisions, or certain qualified persons or entities to accomplish the required investigation. *See id*. § 191.054(a). The permit shall provide for "the survey and discovery, excavation, demolition, or restoration of, or the conduct of scientific or educational studies at, in, or on landmarks, or for the discovery of eligible landmarks on public land . . . ." *See id*. § 191.054(a); *see also* 13 TEX. ADMIN. CODE § 26.3(3). As relevant here, the term "political subdivision," is defined as "a local governmental entity created and operating under the laws of this state, including a city, county, school district, or special district created under Article III, Section 52(b)(1) or (2), or Article XVI, Section 59, of the Texas Constitution." *See* TEX. NAT. RES. CODE ANN § 191.003(4). Supporting these requirements, the

6

Code imposes obligations on those persons, firms, or corporations who conduct salvage or recovery operations on such projects. *See id*. § 191.131(a) (contract requirements); s*ee also id*. § 191.131(b) (permit requirements). Notably, no person, firm, or corporation may "conduct the operation in violation of the provisions of the permit." *See id*. § 191.131(b).

The Code further commands, "[t]he permit shall: (1) be on a form approved by the attorney general; (2) specify the location, nature of the activity, and the time period covered by the permit; and (3) provide for the termination of any right in the investigator or permittee under the permit on the violation of any of the terms of the permit." *See id*. § 191.054(c). Moreover, section 191.055 provides that all scientific investigations or recovery operations conducted under a permit or contract, must be carried out:

(1)     under the general supervision of [the THC];

(2)     in accordance with reasonable rules adopted by [the THC]; and

(3)     in such manner that the maximum amount of historic, scientific, archeological, and educational information may be recovered and preserved in addition to the physical recovery of items.

*See id.* § 191.055.

### 3.  The permit process

Because a substantial portion of the testimony and argument at the temporary injunction hearing related to the parties' interpretation of what is required with regard to an application for an archeological permit, and what the City actually did in compliance thereto, we also set forth the pertinent rules of the THC with regard to permit requirements.

As required by the Code, the THC adopted rules in regard to the administration and enforcement of Code provisions. *See* TEX. NAT. RES. CODE ANN. § 191.055(2); *see also* 13 TEX. ADMIN. CODE §§ 26.1-26.28. Pursuant to administrative rules, archeological investigations or project work are overseen by the THC through the permitting process. *See* 13 TEX. ADMIN. CODE

7

§ 26.2(5) (citing TEX. NAT. RES. CODE ANN. §§ 191.054 and .055); *see also id*. § 26.7(a) (citing TEX. NAT. RES. CODE ANN. § 191.002). Upon submission of a completed application, the staff of the THC must respond within 30 days by notifying the applicant whether the permit application is complete and accepted for filing or by specifying that additional information is required for the review. 13 TEX. ADMIN. CODE § 26.14(a)(1). If no response is timely received from the THC, the permit is deemed granted by operation of the rules. *See id*. § 26.14(a)(4).

Upon substantive review of an application, the THC may issue a permit, issue a permit with special conditions, request additional information for review, request a revised scope of work or research design, or deny the permit application. *Id*. § 26.14(a). The Code provides a permit will contain "all special requirements governing that particular investigation[,]" and it must also be signed by the director of the Archeology Division of the THC, or his or her designated representative. *Id*. § 26.14(c). The investigation may begin upon receipt of notification of the assignment of a permit number. *Id*. § 26.14(a)(1). Thereafter, "[p]roposed changes in the terms and conditions of the permit must be approved by [the THC]." *Id*. § 26.14(i).

The steps for acquiring a THC permit for archeology are detailed in subchapter C of the administrative rules. *See* 13 TEX. ADMIN. CODE §§ 26.10-26.18. To begin, section 26.13 sets forth the requirements implicated whenever a state agency or political subdivision applies for a permit. *See id*. § 26.13(b). Section 26.13 requires that "[i]nvestigations undertaken on publicly owned cultural resources or to locate or discover such resources must be oriented toward solving a particular research problem, [preparing] . . . a site for public interpretation, or for the purpose of salvaging information and specimens from a site threatened with immediate destruction." *See id*. § 26.13(a). To that aim, the permit application requires "a statement of the purpose of the investigation[,] . . . an outline of the proposed work and research design[,] . . . and . . . evidence

of adequate funds, personnel, equipment, and facilities to properly complete the proposed investigation." *See id*. § 26.13(c)(1)-(7). Research designs prepared prior to a field study are recognized as being "essential to the success of scientific objectives, resource management decision-making, and project management." *See id*. § 26.13(d).

Several points should be considered in formulating a research design. *Id*. First, that research designs "present the essential objectives of a project or study and the means by which those objectives will be attained." *Id*. § 26.13(d)(1). Second, that a research design provides "a logical basis for detailed project planning and assessment of resource significance." *Id*. § 26.13(d)(2). Third, that a research design may contain a wide range of theoretical and methodological approaches. *Id*. § 26.13(d)(3). A research design may address general research objectives or take a more focused orientation. *Id*. In either event, the following criteria must be met:

> (A) Care should be taken to link the research design to existing topical and geographical bodies of data.
>
> (B) The nature of the resources under investigation should be considered.
>
> (C) The need to address a wide range of cultural and scientific resources should be considered.
>
> (D) Applied research that addresses cultural resource management and impact-related issues should be recognized as necessary and incorporated into research designs whenever possible.
>
> (E) The skills of the investigative personnel must be appropriate to the project goals and specifications in the research design. In many cases it may be desirable to include provisions for consultants with special expertise.

*Id*. § 26.13(d)(3)(A)-(E).

As a final point, research designs should not be conceived as rigid, unchanging plans. *Id*. § 26.13(d)(4). Instead, the rule states, "as circumstances warrant, the investigator is not relieved of responsibility to recognize other research." *Id*. Accordingly, section 26.13 provides that, "[a]

9

conscious effort should be made to modify research designs to exploit new information efficiently." *Id*. In doing so, the section further states, "[t]he crucial objectives in the modification process are: (A) demonstrated progress in solving stated problems; and (B) subsequent modification of a research design on the basis of explicit, rational decisions intended to attain stated goals." *Id*.

Demonstrating the THC's ongoing supervision of permit obligations, section 26.18(a) provides, "[i]f the permittee, project sponsor, principal investigator or other professional personnel, or investigative firm or other professional firm fails to comply with any of the rules of the commission or any of the terms of the specific permit involved, or fails to properly conduct or complete the project, or fails to act in the best interest of the state, or fails to meet terms and conditions of defaulted permits, the commission may cancel the permit and notify the permittee of such cancellation . . . ." *Id*. § 26.18(a). And permit cancellation may occur even while the on-site work is being performed. If a permit is cancelled, the permittee, principal investigator, and other professional persons shall cease work immediately, remove all personnel and equipment, and vacate the site within 24 hours. *Id*. Thereafter, a cancelled permit may be reinstated by the THC if good cause is shown within 30 days. *Id*.

Emphasizing the importance of the Code's requirements, section 26.18(b) further mandates that, "[a] principal investigator and investigative firm or other professional firm shall not proceed with an investigation without applying for and receiving an appropriate permit by the commission, or without having been officially authorized by the commission to proceed prior to issuance of an emergency permit. *Id*. § 26.18(b). Moreover, project sponsors and permittees shall not encourage investigations on public lands in the State of Texas without a properly issued permit. *Id*. § 26.18(c).

"Such investigations proceeding with the knowledge of the project sponsor and/or permittee constitute a violation of the Antiquities Code of Texas." *Id.*

### C. Factual and Procedural Background

#### 1. The lawsuits filed in El Paso and Travis County

In July 2017, Grossman filed the underlying suit in the 384th District Court of El Paso County against the City of El Paso with regard to its plan to build an arena in the Duranguito-Union Plaza neighborhood of the city. The original petition alleged the City had violated mandatory provisions of the Antiquities Code based on the City not having given advance notice to the THC of the City's planned project on public land. *See* TEX. NAT. RES. CODE ANN. § 191.0525. Among claims for relief, Grossman sought a permanent injunction ordering the City to properly notify the THC of the project and to take any and all other actions in compliance with section 191.0525 of the Code.

Grossman's suit asserted, "[m]any of the buildings the City has or will cause to be demolished as part of its arena project have historical and architectural significance." Relying on a 1998 survey, the suit claimed the Union Plaza area encompassed "part of the original Ponce de Leon ranch (El Paso's first community)," containing historic sites and buildings which would be impacted by construction during redevelopment. Along with the petition, affidavits were included indicating the City had been informed in December 2016 of its obligation to notify the THC, but it had not yet done so. Grossman also asserted the City planned to acquire—and thereafter demolish—many historic buildings of the established neighborhood.

Within the suit's factual background, Grossman revealed he had entered an appearance in a pending suit filed by the City. In May 2017, the City filed a bond validation suit in the 250th District Court of Travis County, Texas, Cause No. D-1-GN-17-001888, pursuant to Chapter 1205 of the Government Code. *See Ex parte City of El Paso*, 563 S.W.3d 517, 519-20 (Tex. App.—

11

Austin 2018, pet. denied). Concerned with possible opposition to plans, the City sought to validate the general obligation bonds that were planned to finance the construction of several projects including the proposed MPC or downtown arena. Along with other interested parties, Grossman appeared in the Travis County suit asserting the city's ordinance had authorized a facility for "performing arts," not for "sports," as was then contemplated by the City. *Id*. at 521. The other parties who appeared in the suit presented arguments asserting the City could only use bond funds to improve an existing facility, not to build new structures; that the failure to specify the downtown location of the arena on the voting ballot was fraudulent; and, that the downtown facility could host only "cultural and performing arts," not sports. *Id*. Of note, the pendency of the bond validation suit impacted the relief Grossman sought in the El Paso suit as the Travis County court had already issued a temporary injunction prohibiting the City from demolishing any structures within the proposed footprint of the City's downtown project.

Following a bench trial, the Travis County district court announced it would find in favor of the City regarding the validity and legality of the bond expenditures, but it had concluded that the expenditure of funds on a sports arena was not allowed under the terms of the ordinance. *Id*. Before rendition of a final judgment, Grossman had by then filed his El Paso suit. *Id*. The City asked the Travis County district court to enjoin further prosecution of the El Paso lawsuit pursuant to TEX. GOV'T CODE ANN. § 1205.061 (authorizing injunction), or under its equitable power to issue an anti-suit injunction. *Id*. at 521-22. The Travis County district court denied the City's

12

request to permanently enjoin the El Paso suit. *Id*. at 522. Thereafter, the City appealed to the Third Court of Appeals in Austin.[6] *Id.* at 528.

Meanwhile, in the El Paso suit, the City filed a plea to the jurisdiction in September 2017. The City argued the Uniform Declaratory Judgment Act did not contain a waiver of governmental immunity, and the Antiquities Code only provided a limited waiver that did not authorize declaratory relief. After the trial court denied the jurisdictional plea, the City filed an interlocutory appeal. *See City of El Paso v. Grossman*, No. 02-17-00384-CV, 2018 WL 4140461, at *1 (Tex. App.—Fort Worth Aug. 30, 2018, no pet.) (mem. op.). Although the appeal was initially filed with this Court, the Supreme Court of Texas subsequently transferred the case to the Second Court of Appeals in Fort Worth. *See id.*, at *2.

While the appeals remained pending, the City, through its agent Moore Archeological Consulting, Inc. ("Moore Consulting"), provided notice to the THC of the planned arena project on May 23, 2018. Douglas Mangum, a principal investigator of Moore Consulting, sent a letter informing the THC it had been hired to undertake an archeological examination on behalf of the City for a proposed project in downtown El Paso. The letter described the City had planned to build a "Multipurpose Performing Arts and Entertainment Center" at the project site. Mangum acknowledged the scale of the project exceeded the threshold requirements for THC notification. Mangum further disclosed that "most of the extant structures present within the project footprint area will be demolished." He also indicated, "it is anticipated that ground-disturbing excavations will take place down to archeologically significant depths."

---

[6] On appeal, the Austin Court of Appeals found the grammatically correct reading of the city's ordinance authorized it "to build a facility that is suitable for multiple performing arts and entertainment purposes, including sports." *Ex parte City of El Paso*, 563 S.W.3d at 525. Thereafter, Grossman and one other party who had intervened in the bond validation suit filed petitions for review with the Supreme Court of Texas. Petition for Review, *Ex parte City of El Paso*, No. 19-0022 (denied Jan. 17, 2020); Petition for Review #2, *Ex parte City of El Paso*, No. 19-0022 (denied Jan. 17, 2020). After both petitions were denied, Grossman and the other party parties filed motions for rehearing, which were denied in June 2020.

Additionally, Mangum acknowledged the tract of land of the proposed project had previously been evaluated by a THC reviewer in August 2000. He described, "[a]t that time, it was noted that an archaeological survey would be required in the event that any constructions were planned that would exceed three feet in depth." He further represented that qualified staff members of his firm were then performing "in-depth archival research of the history of the project area and its immediate surroundings, including the extant buildings and their use/occupation over time." Mangum asserted, "[w]e believe that there is demonstrated potential for historic and even prehistoric cultural resources within the tract wherever prior deep impacts have not already disturbed or destroyed them." Upon receipt of a response from the THC, the letter disclosed that Mangum's firm planned to develop a research design and permit application for a subsurface survey of the tract. Mangum assured, "[t]his research design will be deeply informed by the results of the archival investigations."

By letter dated June 27, 2018, the THC confirmed the proposed project was subject to the Antiquities Code of Texas given the project was being conducted "on behalf of the City of El Paso, a political subdivision of the State, and on land that is owned or will be acquired by the City . . . ." Accordingly, the THC requested that Mangum submit a permit application and research design for THC review.

### 2. The City applies for, and receives, an archeological permit

On August 8, 2018, the City of El Paso, as land owner, and Douglas Mangum, as principal investigator employed by Moore Consulting, submitted an Antiquities Permit Application on the THC's required form. The application attached a document titled, "Scope of Work and Research

14

Design for Archeological Investigations in Support of the Proposed El Paso Multipurpose Performing Arts Center, El Paso County, Texas" (the Survey), dated August 7, 2018.[7]

The Survey proposed the project area be investigated in phases, the first two of which are pertinent here. The first phase would involve a remote sensing survey conducted using ground penetrating radar ("GPR"). The Survey specifically recommended that open spaces (e.g., streets, vacant lots, parking lots, walkways) be examined using such GPR. The proposal further described, "[a]s buildings currently extant within the project area are demolished down to the current ground surface, the footprints of these spaces, too, will be surveyed by GPR until 100% of [the Arena] footprint has been examined." The results of this GPR would then be evaluated to determine a focused strategy for conducting the second phase—a mechanical survey of the project area. This mechanical survey would include shallow surface scraping, excavation of exploratory trenches in strategic locations, and sifting of extracted fill using 1/4-inch screens.

The Survey's research design identified source materials relied on in support of the description of archeological evidence of human occupation of the project area. The document identifies the project area as the "Trans-Pecos region." Extending into the Republic of Mexico, the Historic period of that area is described as beginning in 1659, "with the establishment of Mission de Nuestra Señora de Guadalupe at El Paso del Norte (now Ciudad Juárez), immediately on the south side of the Rio Grande." The Survey asserts this Juárez mission served as an important waypoint on the road from Mexico City to Santa Fe. It further notes, "review of several period maps of the region shows no Hispanic settlements north of the river, on the site of modern El Paso, until the Mexican national period." It further provides, however, "[s]everal Apache groups were

---

[7] The original Scope of Work and Research Design was dated July 11, 2018. But, on submission to the THC, the document was dated August 7, 2018. Later, it was revised and dated September 27, 2018.

also present in the El Paso area during the Historic period including the Mescalero, Natagé, and Gila bands (Newcomb 1961; Sonnichsen 1968)." Identifying the origin of modern-day El Paso, the Survey claims:

> In 1827, Juan Maria Ponce de Leon, a wealthy resident of Paso del Norte, received a grant of land north of the Rio Grande which would eventually form the nucleus of modern downtown El Paso, including the project area (Bowden 1969; Metz 1999; Strickland 1963; Timmons 1990). Ponce built an adobe house and other outbuildings, began an acequia system, planted vineyards and orchards, and raised livestock north of the river.

Following the submission of the permit application, the City awaited a response from the THC. With regard to the pending litigation, the City's submission directly impacted the interlocutory appeal pending in the Fort Worth Court of Appeals. On August 30, 2018, the court issued a two-part ruling. *City of El Paso*, 2018 WL 4140461, at *1. First, the court held, "the portion of Grossman's original petition requesting a declaratory judgment that the City be required to properly notify THC [was] moot . . . ." *Id*., at *3. Second, it also held the remainder of Grossman's claim for declaratory judgment "appear[] merely to be unripe for our review." *Id*. In other words, the court decided the trial court was best suited to determine any pending claim. Based on these rulings, the court dismissed the City's interlocutory appeal and released the temporary injunction that had been issued pending the appeal. *Id*.

With jurisdiction returned to the trial court, the City subsequently filed, on September 27, 2018, a motion to dissolve temporary agreed order and to deny Grossman's request for temporary injunction. A week later, the City also filed a second plea to the jurisdiction with respect to Grossman's declaratory judgment cause of action. As part of his response, Grossman opposed the jurisdictional plea and further asserted there remained a need for temporary orders. He urged that, "Duranguito must be left undisturbed until the survey has been completed and approved by the

16

THC and any safeguards required by the THC in the Permit are implemented." Before the trial court ruled on the request for temporary relief, however, the circumstances changed.

On October 15, 2018, the THC issued permit number 8525 (the "Permit"), authorizing an "Intensive Survey," on a potential or designated landmark, or other public land, in downtown El Paso. On the face of the Permit, it listed the public land as being owned or controlled by the City of El Paso, which it thereafter referred to as the "Permittee." Moreover, Douglas Mangum and Moore Archeological Consulting, Inc., were named as the Principal Investigator and Investigative Firm, respectively. The Permit reflects it was effective for a period of 10 years, expiring on October 15, 2028. Upon completion of the final permit report, it further provided that the "artifacts, field notes, and other data will be placed in a permanent curatorial repository at: Centennial Museum, UT of El Paso." The Permit described the Scope of Work consisted of "Remote Sensing and Mechanical Survey of Project Area (See Application scope of work and research design for additional details)[.]" Following a list of terms and conditions that must be followed, the Permit was signed by the Executive Director of the THC and the Archeology Division Director.

Days after permit issuance, Grossman's attorney sent a letter to the THC. Stating he had received an unsigned copy of the permit, Grossman's attorney noted he had reviewed the underlying application, the scope of work and the research design prepared for the City's proposed project, and he wanted to point out that part of the scope of work, if performed, would violate Section 191.0525(a)(3) of the Antiquities Code. Specifically, he pointed to provisions indicating that buildings within the project area would be demolished, to ground surface, while the open spaces were examined with remote sensing technology. After quoting from the statutory provision prohibiting the commencement of a project until after completion of an archeological survey, the letter asserted, "[d]emolishing the buildings on the [project] site is tantamount to commencing

17

construction of the project." In closing, the letter requested the THC to immediately withdraw approval of the part of the scope of work that called for demolition of buildings on the site until completion of the archeological survey.

On October 25, 2018, Grossman and the City entered into a Rule 11 Agreement in connection with the El Paso lawsuit. Grossman agreed to amend his pleading to remove a declaratory judgment action against the City and proceed solely pursuant to the claim under Chapter 191 of the Antiquities Code. In exchange, the City agreed it would not begin, or otherwise permit others to begin, actual demolition of any building in the project's footprint prior to a hearing on Grossman's application for a temporary injunction.

As agreed, Grossman soon filed an amended petition asserting the project could not commence until the archeological survey was completed pursuant to Antiquities Code Section 191.0525(b). *See* TEX. NAT. RES. CODE ANN § 191.0525(b) ("If the [THC] determines that an archeological survey is necessary at the project location, the project may not commence until the archeological survey is completed."). The factual background of the amended petition described that many of the buildings in the project footprint have historical and architectural significance. Although Grossman acknowledged the City had since complied with notice provisions of the Antiquities Code, as well as having since obtained a permit from the THC, he further alleged the City's obligations were not fully satisfied. The amended petition sought an order requiring the City to amend the scope of work attached to its permit application to remove any proposal to demolish buildings before the survey was completed.

### 3. The suit filed against the Executive Director of the THC

With the filing of the amended petition, Grossman also revealed he had since filed suit in Travis County against Mark Wolfe, the Executive Director of the THC (the "Wolfe suit").[8] In that suit, Grossman alleged the permit issued to the City was not valid because (1) Wolfe acted *ultra vires* by issuing the permit himself without the Commission's approval, and (2) the permit violated the Code by allowing the City to demolish the existing buildings before the archeological survey was completed. *See Grossman v. Wolfe*, 578 S.W.3d 250, 254 (Tex. App.—Austin 2019, pet. denied); *see also* TEX. NAT. RES. CODE ANN. § 191.0525(c) ("the project may not commence until the archeological survey is completed"). Grossman requested the district court declare the permit void and issue an injunction prohibiting the City from conducting the survey as authorized by Director Wolfe. *Wolfe*, 578 S.W.3d at 254.

The City soon intervened in the suit against Director Wolfe, asserting a general denial and joining Wolfe in urging that Grossman's *ultra vires* claims were barred by sovereign immunity. *Id*. at 255. After sustaining the jurisdictional plea, the trial court dismissed Grossman's claim against Wolfe. *Id*. Grossman appealed that decision to the Third Court of Appeals, which issued a decision on June 21, 2019.

On appeal, the court held that Grossman had failed to assert an *ultra vires* claim against Wolfe. *Id*. The decision also addressed Grossman's contention that Section 191.173 of the Code waived Wolfe's immunity. *Id*. at 257 (citing TEX. NAT. RES. CODE ANN. § 191.173(a)) ("[a] citizen of the State of Texas may bring an action in any court of competent jurisdiction for restraining orders and injunctive relief to restrain and enjoin violations or threatened violations of this chapter . . . ."). Ultimately, the court rejected Grossman's waiver argument—which was asserted against Wolfe as Executive Director of the THC—holding instead that section 191.173 does not contain

---

[8] *See Grossman v. Wolfe*, 578 S.W.3d 250, 253 (Tex. App.—Austin 2019, pet. denied).

19

such a waiver of sovereign immunity. *Wolfe*, 578 S.W.3d at 261. Following the adverse ruling, Grossman filed a petition for review in the Supreme Court of Texas.[9]

Meanwhile, in the underlying suit pending in the El Paso district court, the trial court signed an agreed order staying the case until the earlier of: (1) a final decision by the Supreme Court of Texas in *Ex parte City of El Paso*, Cause No. 19-0022, or (2) a final decision by the Third Court of Appels in *Grossman v. Wolfe*, Cause No. 03-19-00002-CV. Consistent with the stay order, the THC informed the City, by letter dated June 24, 2019, that the archeological permit for the project was suspended until further notice.

### 4. Newly discovered research during the interim stay

While appeals remained pending, Grossman directed his attorney to send correspondence to the THC and to the City about newly discovered research that impacted the arena project. As directed, Grossman's counsel, Francis S. Ainsa, Jr., sent a letter dated September 3, 2019. The letter opened with the following line:

> Please consider this letter to be a formal request to the Texas Historical Commission (THC) to require the City of El Paso to revise the document entitled Research Design for the City of El Paso Multipurpose Arts and Entertainment Center, dated July 10, 2018, and all amendments or supplements thereto that were prepared by its archeological consultant Moore Archeological Consulting, Inc.

The Ainsa letter based the request for a revised scope of work on research newly revealed in a book authored by Mark Santiago, which was published in October 2018. Santiago titled the book, A BAD PEACE AND A GOOD WAR—SPAIN AND THE MESCALERO APACHE UPRISING 1795-1799. The letter further described that Santiago's book was "widely regarded as seminal because it is based on newly discovered Spanish Colonial documents that were newly found in various archives." Attorney Ainsa further asserted the source documents of the research reveal "completely

---

[9] Petition for Review, *Ex parte City of El Paso*, No. 19-0022 (denied Jan. 17, 2020).

20

new information that has radically revised our knowledge of the history of the relations between the Spanish and the Mescalero Apaches at the El Paso Rio Grande border."

Specifically, the letter described the connection between the newly discovered research and the arena project permit, as follows:

> Mr. Santiago's book is enormously significant for the history of El Paso because it has established for the first time that there was a large Mescalero Apache peace camp on the north bank of the Rio Grande, directly opposite Paso del Norte (now called Ciudad Juárez). Experts that have been consulted by my client have opined that the area that we informally refer to as Duranguito, which is the subject of the Permit and the Research Design, was located within the Peace Establishment (a/k/a Peace Camp), since at the time it lay on the north bank of the Rio Grande at the closest point to Paso del Norte. Apaches were encamped at this Peace Camp intermittently between 1778 and 1825. Between 1790 and 1794 they occupied the site continuously and reached a peak population of more than 500.

Additionally, the letter informed the THC that certain experts had unanimously affirmed that Moore Consulting's research design was invalid, or insufficient, not only because it failed to account for the peace establishment discovered by Santiago's work, but also, because it did not contain a scope of work designed to uncover, study, and retrieve artifacts from the peace establishment era. The letter requested the existing permit remain suspended until a completely new research design and scope of work could be developed. Enclosed with the letter, attorney Ainsa included declarations from six persons identified as "experts" who unanimously affirm that the research design prepared by Moore Consulting is invalid or insufficient because it neither accounts for the Peace Establishment in Duranguito, nor does the related scope of work attempt to uncover, study, and retrieve any artifacts from the Peace Establishment era nor preserve the area for future study. The six declarants included Matthew Babcock, Ph.D., David Romo, Ph.D., Mark Cioc-Ortega, Ph.D., Harry W. Clark, David Carmichael, Ph.D., and Mark Santiago. Neither the THC nor the City responded to Ainsa's letter.

21

Instead, on October 7, 2019, the THC notified the City that the archeological permit had been reinstated following the denial of the petition for review by the Supreme Court of Texas in *Grossman v. Wolfe,* No. 19-0521 (Tex. Aug. 9, 2019). And, on a second point, the letter informed the City of "a recent publication by Mark Santiago titled A BAD PEACE AND A GOOD WAR—SPAIN AND THE MESCALERO APACHE UPRISING 1795-1799." The letter further described the book as reporting on "recently discovered and translated Spanish Colonial documents that reveal new information on Spanish and Mescalero Apache relations, including a description of a Mescalero Apache peace establishment along the northern banks of the Rio Grande." The letter further noted, "[s]ome experts believe the area referred to as Duranguito may be located within this establishment." The THC recommended that the City familiarize itself with Santiago's work and consider the potential for encountering cultural deposits associated with the peace camp during the investigations.

## 5. The amended El Paso suit

The same date of the THC letter, Grossman again amended his petition of this underlying suit. The amended petition asserted, "the Project should not proceed until a completely new Research Design can be developed that properly accounts for the existence of the Peace Establishment in Duranguito and contains an acceptable Scope of Work that is designed to uncover, study, and retrieve artifacts from the Peace Establishment era and preserve this area for future study." Grossman's amended petition requested, before trial on the merits, that the trial court grant a temporary order enjoining the City from performing the archeological survey approved by the permit, until the research design and scope of work are modified to account for the Peace Establishment in Duranguito.

Thereafter, on October 21, 2019, the trial court conducted a two-day evidentiary hearing on the application for temporary injunction, as well as hearing argument on the City's plea to the jurisdiction. In addition to Grossman and Mangum, the principal investigator of Moore Consulting, the court also heard from three other witnesses having expertise in archeology, anthropology, and borderland history. Grossman and his witnesses gave opinions regarding what they perceived to be deficiencies in the research performed by Moore Consulting and the methods it proposed for conducting the archeological survey, including criticism of demolishing the buildings before completion of the survey, the proposed depth of excavation, and the use of 1/4-inch screens.

After taking the matter under advisement, the trial court denied both the application for a temporary injunction and the plea to the jurisdiction. Afterward, both parties appealed. We consolidated both appeals into the case presently before us. We also granted a motion for emergency relief staying commencement of the project—including any demolition of buildings within the project footprint—until the Court had the opportunity to fully review the appeal.

## II. ISSUES ON CROSS-APPEAL

In a single issue, Grossman contends the trial court abused its discretion by denying his request for a temporary injunction, which he brought based on his claim of violations or threatened violations of the Antiquities Code of Texas. Grossman asserts the denial of injunctive relief essentially gives the green light to the City to proceed with its project on public land with no protection in place for safeguarding the resources and remains of the Mescalero Apache Indian Tribe that are undisputedly located within the area of the project.

On cross-appeal, the City also presents a single issue contending the trial court erred by denying its plea to the jurisdiction. The City contends the trial court should have dismissed Grossman's suit because his claims are barred by governmental immunity.

23

As a threshold issue, we turn first to the City's Plea to the Jurisdiction.

### III. THE PLEA TO THE JURISDICTION

The City asserts the trial court erred when it denied its plea to the jurisdiction. Specifically, the City argues that Grossman's claims are barred by governmental immunity.

### A. Standard of Review

Whether a court has subject matter jurisdiction is a question of law and is, therefore, subject to de novo review. *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013); *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply*, LLC, 397 S.W.3d 162, 166 (Tex. 2013). When a plea to the jurisdiction challenges the pleadings, the reviewing court determines whether the plaintiff has alleged facts affirmatively demonstrating the court's jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). The court construes the pleadings liberally in favor of the plaintiff. *Miranda*, 133 S.W.3d at 226.

### B. Governmental Immunity

"Sovereign immunity protects the state and its various divisions, such as agencies and boards, from suit and liability, whereas governmental immunity provides similar protection to the political subdivisions of the state, such as counties, cities, and school districts." *Harris Cty. v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018) (quoting *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57-58 (Tex. 2011)). Unless waived, governmental immunity defeats the trial court's subject matter jurisdiction. *See City of Houston v. Houston Mun. Employees' Pension Sys.*, 549 S.W.3d 566, 575 (Tex. 2018); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). Waiver of such immunity may be accomplished by the Legislature, but only if the waiver

24

is "clear and unambiguous." *See Annab*, 547 S.W.3d at 613; *Oncor Elec. Delivery Co. v. Dallas Area Rapid Transit*, 369 S.W.3d 845, 849 (Tex. 2012); TEX. GOV'T CODE ANN. § 311.034.

As the Supreme Court of Texas has instructed, the clear and unambiguous requirement, "is not an end in itself, but merely a method to guarantee that courts adhere to legislative intent." *Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 3 (Tex. 2000). The Supreme Court cautioned that, "the doctrine should not be applied mechanically to defeat the true purpose of the law." *Id*. The Court reaffirmed that it had explained several years prior that legislative intent remained the primary objective in deciding whether immunity has been waived:

> The rule requiring a waiver of governmental immunity to be clear and unambiguous cannot be applied so rigidly that the almost certain intent of the Legislature is disregarded. Legislative intent remains the polestar of statutory construction. We will not read statutory language to be pointless if it is reasonably susceptible of another construction. If a statute leaves no reasonable doubt of its purpose, we will not require perfect clarity, even in determining whether governmental immunity has been waived.

*Id*. (quoting *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995) (citations omitted)). Thus, "[t]he polestar of statutory construction is legislative intent, which we determine from the enacted language." *In re Tex. Educ. Agency*, 619 S.W.3d 679, 687 (Tex. 2021).

## C. Application

In opposing the City's argument, Grossman responds, first, that the City has already conceded in an earlier plea to the jurisdiction that the Antiquities Code includes a limited waiver of immunity.[10] Regardless, even if conceded, we must still recognize that governmental immunity implicates subject matter jurisdiction. *Engelman Irrigation Dist. v. Shields Brothers, Inc.*, 514 S.W.3d 746, 751 (Tex. 2017); *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012). And, for courts, such jurisdiction "cannot be conferred by consent, waiver, or estoppel at any time."

---

[10] Even so, the City argued in that prior plea that it retained its governmental immunity.

*Bustamante v. Miranda & Maldonado, P.C.*, 569 S.W.3d 852, 863 (Tex. App.—El Paso 2019, no pet.). Accordingly, we first hold that the City did not earlier concede that the trial court lacked jurisdiction nor did it waive its right to assert governmental immunity as a basis for a lack of jurisdiction.

Turning to the merits of the issue, Grossman contends the Legislature waived the City's governmental immunity by enacting Section 191.173 of the Antiquities Code. *See* TEX. NAT. RES. CODE ANN. § 191.173. That provision states, in pertinent part, that "[a] citizen of the State of Texas may bring an action in any court of competent jurisdiction for restraining orders and injunctive relief to restrain and enjoin violations or threatened violations of this chapter . . . ." TEX. NAT. RES. CODE ANN. § 191.173(a). In plain terms, this language clearly confers standing on any Texas citizen, including Grossman, to bring an action regardless of whether he can show himself individually aggrieved by the violation or threatened violation. *See Wolfe*, 578 S.W.3d at 257-58. The question remains, though, whether this language evinces an intent by the Legislature to waive the City's governmental immunity. In other words, while the statute clearly provides that Grossman himself may sue on the basis of the state's public interest, we must further determine whether it provides that a suit for injunctive relief may be brought against a political subdivision such as the City of El Paso.

On cross-appeal, the City asserts that Grossman wants the courts to intercede and force the THC to issue a different permit. The Third Court of Appeals held in *Wolfe* that "the Antiquities Code does not waive the [THC's] sovereign immunity." *Wolfe*, 578 S.W.3d at 261. For that holding it relied on its previous decision in *Bacon v. Texas Historical Commission*, 411 S.W.3d 161 (Tex. App.—Austin 2013, no pet.). The statute at issue in *Bacon* provided, in language nearly identical to section 191.173, that "any resident of this state may file suit in district court to restrain

26

and enjoin a violation or threatened violation of this chapter or Chapter 191, Natural Resources Code . . . ." TEX. GOV'T CODE ANN. § 442.012(a). The court rejected Bacon's contention that this language waived the THC's immunity because it "mentions nothing about immunity or governmental defendants" and "[a]s such, it is not a clear and unambiguous waiver of sovereign immunity." *Bacon*, 411 S.W.3d at 177. Being distinct from *Wolfe*, however, Grossman's pleading at issue here does not challenge any decisions of the THC. Rather, he asserts a claim solely against the City, not the THC; and such claim is based on the City's actions only, that is, that it plans to break ground at a project on local, public land of a size qualifying for THC review and supervision. *See* TEX. NAT. RES. CODE ANN § 191.0525(a) and (d).

Instead of the decision of *Wolfe*, we are guided here by recent instructions of the Supreme Court of Texas in *Hillman v. Nueces Cty*, 579 S.W.3d 354, 360 (Tex. 2019). For "deciding whether a statute clearly and unambiguously waives governmental immunity," *Hillman* instructs courts to:

(1) consider whether the statutory provisions, even if not a model of clarity, waive immunity without doubt;

(2) resolve any ambiguity as to waiver . . . in favor of retaining immunity;

(3) generally[,] find waiver if the Legislature requires that the [governmental] entity be joined in a lawsuit even though the entity would otherwise be immune from suit;

(4) consider whether the legislature provided an objective limitation on the governmental entity's potential liability; and

(5) consider whether the statutory provisions would serve any purpose absent a waiver of immunity.

*Id.* (internal quotation marks omitted).

Applying this analysis to section 191.173, it is apparent that neither factor one nor factor three demonstrates a clear and unambiguous waiver of governmental immunity. The statute makes no mention of immunity or of governmental defendants per se and does not necessarily require that a governmental entity be joined in a lawsuit. *See* TEX. NAT. RES. CODE ANN. § 191.173; *see*

27

*also Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 698 (Tex. 2003) (statute authorizing patient to file suit but not expressly authorizing suit against the State did not waive sovereign immunity).

Factor four, however, does weigh in favor of recognizing a waiver of immunity. Section 191.173 of the Code provides an objective limitation on potential liability by authorizing only restraining orders and injunctive relief. *See* TEX. NAT. RES. CODE ANN. § 191.173. The Supreme Court has recognized that "the modern justification for immunity [is] protecting the public fisc." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 375-76 (Tex. 2009) (citing *Tooke v. City of Mexia*, 197 S.W.3d 325, 331-32 (Tex. 2006)); *see* TEX. GOV'T CODE ANN. § 311.034 (reciting "legislature's interest in managing state fiscal matters" as underlying sovereign immunity). Because section 191.173 does not authorize a suit for damages, but rather, only permits injunctive relief, a finding that it contains a waiver of governmental immunity does not run contrary to the Legislature's interest in protecting the public's financial resources. *See Taylor*, 106 S.W.3d at 701. To that extent, there is no potential governmental liability at risk.

Thus, we turn next to the fifth factor—whether the statute would serve any purpose absent a waiver of immunity. *See Hillman*, 579 S.W.3d at 360. Grossman contends that "[t]he mandates, requirements and duties imposed by the Antiquities Code relate primarily to restrictions placed on *public* land projects." Consequently, he urges, the Code "undoubtedly contemplates suits against governmental entities" and, therefore, waives governmental immunity.

The City, on the other hand, argues that the Code contains provisions that apply to private persons or entities. It cites, for example, section 191.131, which provides that "[n]o person, firm, or corporation may conduct a salvage or recovery operation without first obtaining a contract." TEX. NAT. RES. CODE ANN. § 191.131(a). That prohibition would apply to a private person or entity

and would subject that private person or entity to suit under section 191.173. *See id.*; *see also* TEX. NAT. RES. CODE ANN. §§ 191.132, 191.133. The City concludes that, because some Code provisions can be enforced against private persons or entities, section 191.173 may be given meaning even if governmental immunity is retained.

While some provisions of the Code may apply to conduct by private actors or to private lands, we agree with Grossman that the primary objective of the Code is to effectuate the State's public policy and its interest in locating, protecting, and preserving certain historic, archeological, educational or scientific sites and objects found *on public land* and subject to the control of governmental entities. Indeed, the following provisions expressly apply only to public properties: section 191.0525 ("Before breaking ground at a project location on state or local public land . . ."); section 191.054 ("The [THC] may issue a permit . . . for the survey and discovery, excavation, demolition, or restoration of, or the conduct of scientific or educational studies at, in, or on landmarks, or for the discovery of eligible landmarks on public land . . ."); section 191.091 (shipwrecks and buried treasure "located in, on, or under the surface of land belonging to the State of Texas . . ."); section 191.092 (buildings, artifacts, etc. "located in, on, or under the surface of any land belonging to the State of Texas or to any county, city, or political subdivision of the state . . ."); section 191.093 (identifying landmarks as "the sole property of the State of Texas . . ."); section 191.098 ("A state agency may not alter, renovate, or demolish a building possessed by the state . . .").

Because the Code predominantly applies to public properties, it is apparent that the actors primarily contemplated by the Code are either governmental entities themselves or those acting on such entities' behalf. In the absence of a waiver of governmental immunity, the provisions noted above all lack meaning because they would otherwise be incapable of any enforcement other than

by request for injunctive relief. *Cf. Barfield*, 898 S.W.2d at 296-97 ("the Legislature must have intended by the Anti-Retaliation Law to waive immunity for wrongful discharge for cities which did not waive immunity voluntarily").

Through enactment of the Code, the Legislature created a statutory framework designed to ensure the discovery and preservation of cultural, educational, scientific, or historic assets in accordance with the public policy and public interest of the State. *See* TEX. NAT. RES. CODE ANN. § 191.002. The Legislature further emphasized the public's interest in achieving the stated policy goal by authorizing any Texas citizen to bring suit to require compliance with the statutory framework. *See id.* § 191.173. Exempting governmental entities who are owners of public land from the imposition of injunctive relief—based on established violations or threatened violations of the Code—would directly undermine the efficacy of the statute to the detriment of its declared goal of locating, protecting, and preserving the archeologically significant objects and treasures found in, on, or under land within the State's jurisdiction. And subjecting governmental entities to suits for injunctive relief does not impinge on the legislative interest in protecting public resources—the justification for conferring immunity—because such suit does not seek monetary damages. *See id.*; *see also Heinrich*, 284 S.W.3d at 375-76 (protecting public fisc is modern justification for immunity).

By its plain language, the Code expressly declares it is the public policy and in the public interest of the State to locate, protect, and preserve "all sites, objects, buildings, pre-twentieth century shipwrecks, and locations of historical, archeological, educational, or scientific interest," located in, on, or under any of the land in the State of Texas. *See* TEX. NAT. RES. CODE ANN. § 191.002. Given that policy, the Code imposes notice requirements on a "project locat[ed] on state or local public land," and on "the person primarily responsible for the project or the person's agent

30

. . . ." *See id.* § 191.0525(a). Municipal projects of a cumulative area larger than five acres or disturbing a cumulative area of more than 5,000 cubic yards, whichever measure is triggered first, or if the project is inside a designated historic district or recorded archeological site, are included in the advance review requirements. *See id.* § 191.0525(d). If a historically significant archeological site is likely to be present at the project location, the THC may require additional action to protect the site as well as an archeological survey. *See id.* § 191.0525(a)(1), (2) and (3). These provisions unambiguously apply to governmental actors who are involved with qualifying projects on public land. And Texas citizens are empowered to file suit on behalf of the State's interest, for restraining orders and injunctive relief, to ensure compliance with the chapter, or for the return of items taken in violation of chapter provisions. *See id.* § 191.173(a). To say that a court lacks jurisdiction over a municipality's project on public land would nullify and ignore the plain language of the Code and the legislative intent evidenced by the language. That we cannot do.

Accordingly, we overrule the City's sole issue.

## IV. THE TEMPORARY INJUNCTION

Grossman contends the trial court abused its discretion in refusing to enter a temporary injunction—prohibiting commencement of the project—to preserve the status quo pending trial on the merits.

### A. Standard of Review and Rules of Construction

At a temporary injunction hearing, the only issue before the trial court is whether the applicant is entitled to preservation of the status quo pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex. 1993); *Pharaoh Oil & Gas, Inc. v. Ranchero Esperanza, Ltd.,* 343 S.W.3d 875, 880 (Tex. App.—El Paso 2011, no pet.). The status quo is defined as the "last, actual, peaceable, non-contested status that preceded the pending controversy." *See State v. Sw. Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex.

31

1975). Of note, the continuation of illegal conduct cannot be justified as preservation of the status quo. *In re Newton,* 146 S.W.3d 648, 651 (Tex. 2004); *Houston Compressed Steel Corp. v. State,* 456 S.W.2d 768, 773 (Tex. App.—Houston [1st Dist.] 1970, no writ) ("In an injunction case wherein the very acts sought to be enjoined are acts which prima facie constitute the violation of expressed law, the status quo to be preserved could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation.").

The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court. *Butnaru*, 84 S.W.3d at 204; *Cook v. Tom Brown Ministries*, 385 S.W.3d 592, 599 (Tex. App.—El Paso 2012, pet. denied). We reverse the trial court's order granting or denying injunctive relief only if an abuse of discretion is shown. *Butnaru*, 84 S.W.3d at 204. We may neither substitute our judgment for that of the trial court nor resolve the merits of the underlying case. *Davis v. Huey*, 571 S.W.2d 859, 861 (Tex. 1978). Instead, we view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order is so arbitrary as to exceed the bounds of reasonable discretion. *Cook*, 385 S.W.3d at 600. An abuse of discretion does not exist if the court simply bases its decision on conflicting evidence. *Davis*, 571 S.W.2d at 862.

Our review is much less deferential, however, when it pertains to the resolution of legal issues. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992). A trial court has no discretion in determining what the law is or in applying the law to the facts. *Id*. Accordingly, "[w]here the facts definitively indicate that a party is in violation of the law, a trial court no longer possesses discretion but must enjoin the violation." *Cook*, 385 S.W.3d at 600; *San Miguel v. City of Windcrest*, 40 S.W.3d 104, 107 (Tex. App.—San Antonio 2000, no pet.); *Priest v. Texas Animal Health Com'n*, 780 S.W.2d 874, 876 (Tex. App.—Dallas 1989, no writ). Said differently, a court

abuses its discretion if there is a clear failure to analyze or apply the law correctly. *Walker*, 827 S.W.2d at 840; *In re Dillard Dept. Stores*, 153 S.W.3d 145, 148 (Tex. App.—El Paso 2004, orig. proceeding).

## B. Temporary Injunction Requirements

To obtain a temporary injunction, the applicant generally must plead and prove three elements: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204; *Danbill Partners, L.P. v. Sandoval*, 621 S.W.3d 738, 745 (Tex. App.—El Paso 2020, no pet.). With regard to the first two elements, the required showing may be accomplished by "plead[ing] a cause of action and present[ing] some evidence that tends to sustain it." *City of El Paso v. Caples Land Co.*, 408 S.W.3d 26, 38 (Tex. App.—El Paso 2013, pet. denied); *see also Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Capital Variable*, 527 S.W.3d 492, 499 (Tex. App.—El Paso 2017, no pet.). As for the third element, an irreparable injury is shown if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204.

As much as these elements are required when an applicant pursues common law equitable relief, the requirements differ when injunctive relief is based on a statutory violation. *Butnaru*, 84 S.W.3d at 210; *Republic Ins. Co. v. O'Donnell Motor Co.*, 289 S.W. 1064, 1066 (Tex. App.—Dallas 1926, no writ). "When, as here, an applicant relies upon a statutory source for injunctive relief, the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law." *Cook*, 385 S.W.3d at 599; *Marauder Corp. v. Beall,* 301 S.W.3d 817, 820 (Tex. App.—Dallas 2009, no pet.); *Avila v. State,* 252 S.W.3d 632, 648 (Tex. App.—Tyler 2008, no pet.); *David Jason West and Pydia, Inc. v. State,* 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.).

Here, Grossman filed suit alleging the City was violating or threatening to violate Section 191.002 of the Antiquities Code of Texas. *See* TEX. NAT. RES. CODE ANN. § 191.002. As stated earlier, the Antiquities Code expressly provides that a citizen of the state may bring an action for injunctive relief, in any court of competent jurisdiction, to enjoin violations or threatened violations of the chapter. *See id*. § 191.173(a). The City does not contest Grossman's status as a Texas citizen. Because his application for a temporary injunction is based on an alleged statutory violation—and not on a request for common law equitable relief—we first hold that no evidence of imminent harm, irreparable injury, or an absence of an adequate remedy at law is necessary to support entitlement to injunctive relief. *See Cook*, 385 S.W.3d at 599; *Marauder Corp*., 301 S.W.3d at 820. Rather, the express language of the Antiquities Code controls whether the request for injunctive relief is warranted under the circumstances. With regard to the first element—that is, whether Grossman has a cause of action against the City for a violation or threatened violation of the Antiquities Code—the City relies solely on the assertion that the Code lacks a waiver of governmental immunity. Having overruled that argument in affirming the denial of the City's plea to the jurisdiction, there is no further need to address the first element. Consequently, only the second element required of a temporary injunction remains at issue. We address that element next.

### C. Whether Grossman presented evidence tending to show a probable right to the relief sought

Grossman contends he produced evidence of a valid claim under the Antiquities Code based on the City's failure to prepare a scope of work designed to properly protect and preserve remains of the Mescalero Apache Tribe likely to be buried in the subsurface of the City's proposed arena project. He asserts the evidence established, without conflict, a probable right to the relief sought pending a trial on the merits.

34

With multiple arguments, the City opposes Grossman's claim that he met his evidentiary burden to show a probable right to the relief sought. First, the City argues its survey recognizes the potential for the discovery of Native American artifacts, in general, and, to that extent, it adequately provides for the location, protection, and preservation of a newly discovered Mescalero Apache peace camp without need for revision. Second, the City argues the THC, after being informed of the research confirming the peace camp, reinstated the original permit without requiring any changes. The City argues that response establishes the trial court did not abuse its discretion in denying relief. Third, the City contends Grossman challenged the sufficiency of the survey in *Wolfe v. Grossman*. Having lost that suit, the City claims this suit is barred by res judicata. Alternatively, if res judicata does not apply, the City otherwise urges the reasoning of *Wolfe* should still prevail against Grossman's specific claim asserting that demolition cannot begin until completion of the survey. Finally, based on the permanent injunction rendered in *Ex parte City of El Paso*, the bond validation suit, the City asserts this suit will be dismissed before Grossman's claims can be determined by a trial on the merits.

We begin with the City's argument based on res judicata. Within that discussion we also address related arguments wherein the City relies on judgments rendered in other lawsuits which address the same arena project. We address these arguments first because, if successful, these arguments potentially give the greatest relief to the City, that is, precluding Grossman's claim in its entirety.

**1. Does res judicata or other such claim apply to Grossman's suit?**

The City presents two arguments based on res judicata or issue preclusion. First, the City argues here, as it did below, that Grossman already challenged the sufficiency of the archeological permit in his suit filed against the Executive Director of the THC, Mark Wolfe, and he lost. *See*

35

*Grossman v. Wolfe*, 578 S.W.3d 250, 254 (Tex. App.—Austin 2019, pet. denied). The City points out that it intervened in the *Wolfe* suit and participated throughout that litigation. On that basis, the City argues Grossman's claim, which similarly questions the survey underlying the issued permit, is thus barred by res judicata. And if not barring the claim in its entirety, the City further argues that Grossman's more specific claim asserting the City cannot demolish buildings in the footprint prior to completion of the archeological survey is otherwise precluded. The City contends Grossman sought the same relief in *Wolfe*, but his claim was rejected. *See Wolfe*, 578 S.W.3d at 261. Given the procedural posture of this case, we reject both arguments.

"Res judicata," a Latin term, means "the matter has been adjudged; a thing judicially determined; or a matter settled by judgment." *Abbott Labs. v. Gravis*, 470 S.W.2d 639, 642 (Tex. 1971). This doctrine prevents a party from relitigating claims or causes of action that have been finally adjudicated, including related matters that should have been litigated in prior suits. *In re M.K.R*, 216 S.W.3d 58, 62 (Tex. App.—Fort Worth 2007, no pet.). The application of res judicata expedites justice by putting an end to litigation, while preserving the sanctity of judgments. *Id.* Operating as a bar against a later suit, res judicata requires proof of the following elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Amstadt v. U.S. Brass Corp*., 919 S.W.2d 644, 652 (Tex. 1996).

Both res judicata and collateral estoppel are recognized as affirmative defenses. *See* TEX. R. CIV. P. 94. Operating as pleas in bar, these defenses should ordinarily be raised through a motion for summary judgment or proven at trial. *Interest of A.S.M.*, No. 08-19-00212-CV, 2021 WL 3260625, at *3 (Tex. App.—El Paso July 30, 2021, no pet.); *see also In re D.K.M.*, 242 S.W.3d

863, 865 (Tex. App.—Austin 2007, no pet.); *In re K.B.S.*, 172 S.W.3d 152, 153 (Tex. App.—Beaumont 2005, pet. denied). By challenging a party's right to recover, a plea in bar reaches the merits of a case. *Magellan Terminal Holdings, L.P. v. Vargas*, No. 13-19-00354-CV, 2021 WL 79351, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 7, 2021, no pet.) (mem. op.).

Given the interlocutory posture of the appeal, we are only permitted to review whether Grossman established a right to preserve the status quo of the subject matter of the suit pending a trial on the merits. *Butnaru*, 84 S.W.3d at 204; *see also DeVilbiss v. West*, 600 S.W.2d 767, 768 (Tex. 1980) (per curiam). "It is well settled that a trial court is not authorized to determine the merits of the plea in bar in a hearing on an application for a temporary injunction." *DeVilbiss*, 600 S.W.2d at 768; *see also Vargas*, 2021 WL 79351, at *3 (finding trial court did not err in granting a temporary injunction without considering whether the suit was barred by collateral estoppel). Moreover, "a judgment in one suit will not operate as res judicata to a subsequent suit on the same question between the same parties where, in the interval, facts have changed or new facts have occurred that may alter the parties' legal rights or relations." *TRO-X, L.P. v. Eagle Oil & Gas Co.*, 608 S.W.3d 1, 12 (Tex. App.—Dallas 2018) (mem. op.), *aff'd*, 619 S.W.3d 699 (Tex. 2021).

Here, Grossman argues the new research bringing to light the existence of the Mescalero Apache peace camp was not published until October 2018. Due to the timing of that discovery, the basis of this suit differs in substance from earlier claims pursued in other suits, and the underlying claim of this suit has not yet been litigated in any other jurisdiction. Grossman points out the City wrongly tries to recast his claim as one challenging the adequacy of the issued permit whereas his suit focuses more narrowly on the actions of the City with regard to the new discovery. We agree the suit is based on obligations imposed on solely on permittees, not on questions raised about the

decisions of the THC. And Grossman argues there is no privity between the City and the THC with regard to those obligations.

Without need to decide the factual dispute about the similarity of the claims, or whether privity was otherwise established, we reject the City's argument that res judicata applies due to the procedural limits of the case. Because a plea in bar reaches the merits of a case, neither a trial court nor this Court may consider such a defense when ruling on a temporary injunction request. *See Butnaru*, 84 S.W.3d at 204; *DeVilbiss*, 600 S.W.2d at 768; *Magellan Terminal Holdings*, 2021 WL 79351, at *3; *cf. Fuentes*, 527 S.W.3d at 499 (declining to address limitations defense in appeal from temporary injunction). The scope of our permitted review is limited only to the question of whether Grossman is entitled to preserve the status quo pending trial on the merits. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (providing for interlocutory review of an order refusing an application for a temporary injunction). We decline to address the City's res judicata argument, and all other claims based on prior litigation, given these attacks all challenge the merits of the case and exceed our jurisdictional limit.[11]

### 2. Did Grossman establish a probable right to relief?

We turn next to address whether Grossman established a probable right to a temporary injunction pending a trial on the merits, which is the only element at issue. Grossman argues the evidence tends to show he has a valid claim under the Code for the City's failure to properly provide for a scope of work that accounts for a newly discovered peace camp in the footprint of

---

[11] In like measure, we also decline to address the City's argument asserting that Grossman's lawsuit "will be dismissed" before his claims can be determined by a trial on the merits. For this argument, the City relies on the judgment rendered in *Ex parte City of El Paso*, 563 S.W.3d at 528-29. As Grossman points out, and we agree, the City's motion to dismiss was not before the trial court and does not provide a proper basis for affirming the trial court's order. As we stated in *Fuentes*, "[a] party may not use an appeal of a temporary injunction ruling to get an advance ruling on the merits." 527 S.W.3d at 498 (quoting *Babu v. Zeeck*, 478 S.W.3d 852, 855 (Tex. App.—Eastland 2015, no pet.)). Given our limited jurisdiction, we decline to reach this argument until the trial court has an opportunity to consider it and issue a final judgment.

the project. Narrowly, he argues the City is violating the Code by failing to adequately account or prepare for the likely presence of archeological resources and remains of the peace camp in the scope of work of the survey. He points out the City does not contest that it had no knowledge of the peace camp at the time it submitted its application for a permit to the THC, and having since learned of its existence, it has no plans to revise the scope of work to account for the new discovery. Grossman contends he met his evidentiary burden to support a temporary injunction against commencement of the scope of work, and project generally, for the purpose of maintaining the status quo, until a trial on the merits.

As noted earlier, the Antiquities Code and adopted rules of the THC impose requirements on a permitee, and principal investigator, with regard to obtaining a permit for an archeological survey planned for a project on public land. *See* TEX. NAT. RES. CODE ANN. § 191.055 (providing that all scientific investigations must be carried out under the general supervision of the THC and in accordance with the rules adopted by the THC). Recall the investigation is performed to effectuate the State's interest in preserving the maximum amount of historic, scientific, archeological, and educational information that may be recovered. *See id*.; *see also* § 191.002. Moreover, THC rules impose substantive requirements on the permittee's application to show the proposed investigation will proceed with a stated purpose, based on a proposed work plan, which in turn is based on research, and includes evidence of adequate funds, personnel, equipment, and facilities. *See* 13 TEX. ADMIN. CODE § 26.13(c)(1)-(7). This rule requires the permittee to identify the project scope, objective, budget, and work team on which it will rely "to properly complete the proposed investigation." *Id*. But, more specifically, the proposed investigation must be "oriented toward solving a particular research problem, [to prepare] . . . a site for public interpretation, or for

39

the purpose of salvaging information and specimens from a site threatened with immediate destruction." *See id*. § 26.13(a).

The research design and scope of work (i.e., the investigation) is ordinarily prepared by the principal investigator, or investigative firm, on behalf of the permittee, or project sponsor. *Id*. § 26.18(a). We note that section 26.18 mandates that an investigative firm "shall not proceed with an investigation without applying for and receiving *an appropriate permit* by the [THC], or without having been officially authorized by the [THC] to proceed prior to issuance of an emergency permit." *Id*. § 26.18(b) (emphasis added). And subpart (c) further provides that permittees shall not encourage investigative firms to perform investigations on public land in the State of Texas "without a properly issued permit." *Id*. § 26.18(c). This section further declares that an investigation proceeding without "a properly issued permit" and with the knowledge of the permittee, "constitute a violation of the Antiquities Code of Texas." *Id*.

Pursuant to the permittee's obligation not to encourage an investigative firm to perform investigations without a "properly issued permit," or "an appropriate permit," we determine the answer to this dispute lies squarely within the meaning of those particular terms. Yet, no definition is provided by the pertinent rules. *See id.* § 26.18(b) and (c). In such circumstance, we interpret an administrative rule using the same principles we apply when construing statutes. *Patients Med. Ctr. v. Facility Ins. Corp.*, 623 S.W.3d 336, 341 (Tex. 2021). It is well established, of course, that statutory interpretation raises a question of law reviewed de novo. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017).

In doing so, the Supreme Court instructs that we must "strive to give effect to the promulgating agency's intent, 'which is generally reflected in the rules' plain language.'" *Patients Med. Ctr.*, 623 S.W.3d at 341. Like statutes, administrative rules, should be analyzed as a cohesive,

contextual whole. *Id*. In construing a rule's language, we presume the adopting agency chose the language with care, purposefully choosing each word, while purposefully omitting words not chosen. *Cf. In re Commitment of Bluitt*, 605 S.W.3d 199, 203 (Tex. 2020) (applying statutory construction principles). These principles all hold true even when considering an agency decision construing statutory language. *Cadena Comercial USA Corp.*, 518 S.W.3d at 325 ("An agency's interpretation of a statute it enforces is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language.").

Applying statutory construction principles, then, we employ the plain and common meaning of the words and phrases at issue. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). The term "properly," an adverb, means "strictly accurate: correct." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 996 (11th ed. 2014). While the term "appropriate," an adjective, means "especially suitable or compatible: fitting." *Id*. at 61. And each term is construed together, in context to the rules as a whole, accepting that lawmakers chose their words carefully, both in what is included and what is not. *Cf. Sommers for Alabama & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 754 (Tex. 2017).

We are further guided in this instance by an analogous decision of the Supreme Court of Texas originating from this Court. In *El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521, 532 (Tex. 2020), the Supreme Court construed the term "properly executed" as applied to a lease agreement signed by the superintendent of a publicly funded charter school. Responding to a suit for breach of contract, the school disputed it had waived its immunity protection given the manner in which the superintendent had signed the agreement. At issue in the case, Chapter 271 of the Local Government Code provided for a waiver of immunity for contracts that are "*properly executed* on behalf of the local governmental entity[.]" *Id*. at 531 (citing TEX.

41

LOC. GOV'T CODE ANN. § 271.151(2)(A)). The school argued the lease agreement, though signed, could not be enforced as a binding contract because it had not been properly formed pursuant to requirements of the Education Code which governed the school's operations. *Id*. Specifically, the school asserted the lease was not "properly executed," given the school's governing board had never approved it nor otherwise delegated its authority. *Id.*

The Supreme Court noted the term "properly executed," remained undefined by the Local Government Code. *Id*. Giving the term its plain and common meaning, the Court read the statute "to give effect to every word." *Id*. at 531-32. Doing so, it found the term "proper" to mean "[a]ppropriate, suitable, right, fit, or correct; *according to the rules.*" *Id*. at 532. Construing the words together, and in context to the statute as a whole, the Supreme Court held the term "properly executed contract" lead to "the inexorable conclusion that not *all* executed contracts qualify for [a statutory] waiver." *Id*. Finding the Education Code had imposed formalities on the school which were undisputedly not followed, the Court held the lease agreement had not been properly formed. *Id*. The Court noted, "[i]t is not enough, then, that an open-enrollment charter school's representative signs a contract." *Id*. Rather, in construing all words together without disregarding terms, the Court found that "properly executed," demanded that contracts with a charter school must be formed in the manner the Legislature authorized for the waiver to apply. *Id*.

Applying required principles and guided by our higher court's interpretation of an analogous term, we hold that a permit is "properly issued" when it is issued in accord with the manner authorized by the Legislature. *See id*. Accordingly, a "properly issued permit," is one that follows the prescribed requirements of the Antiquities Code and the adopted rules of the THC. *See* TEX. NAT. RES. CODE ANN. § 191.055 (providing that "[a]ll . . . operations conducted under . . . permits . . . must be carried out: (1) under the general supervision of [the THC]; (2) in accordance

42

with reasonable rules adopted by [the THC]); and (3) in such manner that the maximum amount of historic, scientific, archeological, and educational information may be recovered and preserved in addition to the physical recovery of items."). *See* TEX. NAT. RES. CODE ANN. § 191.055; *see also* 13 TEX. ADMIN. CODE § 26.18 (requiring an "appropriate permit" and "a properly issued permit").

As the rules further provide, an appropriate permit or a properly issued permit is one that is not necessarily fixed or permanent in its original form. Indeed, because new information may come to light, the rules of the THC address that scenario and obligate an investigator not to conceive of the research design as a "rigid, unchanging plan[]." 13 TEX. ADMIN. CODE § 26.13(d)(4). Research designs are recognized as being "essential to the success of scientific objectives, resource management decision-making, and project management." *See id.* § 26.13(d). Section 26.13 further provides, "as circumstances warrant, the investigator is not relieved of responsibility to recognize other research." *Id.* Importantly, investigators are advised that "[a] conscious effort should be made to modify research designs to exploit new information efficiently." *Id.* In doing so, "[t]he crucial objectives in the modification process are: (A) demonstrated progress in solving stated problems; and (B) subsequent modification of a research design on the basis of explicit, rational decisions intended to attain stated goals." *Id.* Nonetheless, coordination with the THC is also required when changes are warranted. Section 26.14 provides, "[w]hen a permit is issued, it will contain all special requirements governing that particular investigation[.]" *Id.* § 26.14(c). Accordingly, "[p]roposed changes in the terms and conditions of the permit must be approved by [the THC]." *Id.* § 26.14(i).

43

Applying this framework, we look to the record to determine whether Grossman established evidence tending to show a probable right to relief—based on a violation or threatened violation of the Code—for the purpose of preserving the status quo pending a trial on the merits.

### 3. The supporting evidence

At the temporary injunction hearing, the trial court heard from three historians, and two archeologists, all testifying as expert witnesses. Additionally, the court admitted into evidence several exhibits from both parties. Relevant to the claim at issue, the witnesses testified about the selected site of the project, the neighborhood of Duranguito, and the planned investigation. Neither party raised objections to the qualifications of any of the expert witnesses or preserved objections against the documentary record.

#### a) The neighborhood of Duranguito

As an associate professor of art and architectural history, Grossman testified about the area of Duranguito relative to the cultural history of the state. As he described, Duranguito was situated on the closest point out in the north bank of the river relative to the Mission of Paso del Norte, near an important crossing point into the Spanish/Mexican territory. At one point, the area bordered the Rio Grande on its northern bank. In the middle 1700s through the 1820s, however, the bed of the river shifted to where it now sits south of Paisano Drive.

Testifying about the historic settlement of the El Paso area, Grossman described that textbooks of local history generally mark the date of 1827 as the city's origin. Specifically, he described that "a wealthy investor in Mexico—Juan Maria Ponce de León—crossed the river in 1827 with a Mexican land grant in hand and established his ranch right there on the eastern border of Duranguito." Yet, that date, he further claimed, may be subject to change due to newly published research of architectural significance.

In October 2018, author Mark Santiago revealed new information, previously unknown. Santiago's research alters the understanding of the area as a settled community. The book titled, A BAD PEACE AND A GOOD WAR—SPAIN AND THE MESCALERO APACHE UPRISING 1795-1799, reveals a critical chapter in the history of the state in that it describes a Native American peace camp existing in the same area of what is now known as Duranguito.

To show the before and after comparison, Grossman first described the state of the historic record before the release of Santiago's book:

> [S]cholars had revealed that the Spanish established what were essentially the first reservations of the Americas; that is, all along the northern frontier of the Viceroyalty of New Spain, the Spanish authorities established Apache peace camps, or reservations. And generally[,] these were established in front of presidios, or fortified communities, oftentimes right on the edge of the Rio Grande opposite a fortress. That was the case of Paso del Norte and, downstream, San Elizario and further downstream, Presidio del Norte, for example.

Although the existence of these peace camps was known generally since at least the 1960s, Grossman clarified that specific knowledge of a particular peace camp—in the area of downtown El Paso—was not as clearly established until release of Santiago's book.

As recounted by Grossman, Santiago wrote about such an "*establecimiento de paz*,"[12] which he documented from his review of primary source materials archived in Spain. Those sources include contemporaneous "communiqués" by commanders of the Spanish military reporting to superiors about the existence and activities of an area peace camp. As translated by Santiago, the source documents include discussions of Apache Indians crossing the river on a daily basis. Grossman testified that linguists have confirmed the accuracy of Santiago's interpretation. Fellow historian, David Romo, Ph.D., who also testified at the hearing, confirmed he, himself, had

---

[12] In detail, Grossman testified: "the phenomenon of Apache peace camps, establecimiento de paz—that phenomenon has been known since at least the 1960s. A number of scholars had revealed that the Spanish established what were essentially the first reservations of the Americas[.]"

45

recently reviewed hundreds of Spanish colonial documents which provide eyewitness accounts of the sighting of Mescalero Apaches in the area.

A key document from 1794, as translated by Santiago's work, describes the Apache camp as being situated in front of town on the other bank of the river. That document establishes the population of the Apache camp between 800 and 1,000 people. The information is particularly significant from an archeological perspective, Grossman asserted, because it reveals the area the Apaches occupied, how long they were there, how many were there, and their presence at a time pre-dating the arrival of Ponce de León. Grossman further described that Duranguito is situated squarely within the area described by the research, at the ford on the river, at the closest point to Paso del Norte. Other documents revealed by Santiago similarly indicate the Apaches participated in the area market, especially women and children of the tribe, who crossed the river daily. The Spanish provided Apaches with rations, to include tobacco, food, and parts, possibly needed to maintain weapons for hunting.

Summarizing the contribution of Santiago's work, Grossman asserted, "we have an entire chapter of El Paso's history that [was] completely unknown, that is, until now[,]" because of the publication of the material. The existence of the peace camp, he asserted, was critically important to the cultural history of the Southwest and the State of Texas, explaining:

> An Apache peace camp has never been excavated. There were somewhere between 9 and 12 of them, depending on the year, established from Tucson all the way to Laredo, and here we have a very large rectangle squarely in the middle of an Apache peace camp. And it's significant for the history of the entire Southwest, the history of the Americas, certainly the history of El Paso. And if this area were destroyed, if it were erased by degrading operations, the reinforced steel concrete caissons and the other operations for building an arena, that information would be lost forever and we would lose forever the opportunity to learn where we came from.

As an expert in borderland history, Dr. Romo endorsed the same view. He described the Apache settlement as having tremendous significance because of the specificity identified by the

46

source materials. Dr. Romo explained that specific landmarks are described where the "establecimiento" was located.[13]

A third historian, Matthew Babcock, Ph.D., who also since reviewed the primary source documents, echoed the testimony of the others by testifying, "I believe that there is an existence of an Apache peace camp from 1790 to 1794 on the north bank of the Rio Grande River[.]"

### b) Attempts to incorporate the peace camp into the scope of work

After learning of Santiago's work, Grossman spoke with colleagues about the adequacy of the planned survey given the book's confirmation of a peace camp, large in size, in the same area. Among others, he spoke with Dr. David Carmichael, a senior archeologist who had experience in Native American excavations in the region, as well as historians, Dr. Romo and Dr. Babcock. Concerned with the aim of the research, Grossman sent a letter to the THC, via his attorney, formally requesting the agency "require the City of El Paso to revise the document entitled, *Research Design for the City of El Paso Multipurpose Arts and Entertainment Center*, dated July 10, 2018, and all amendments or supplements thereto that were prepared by its archeological consultant Moore Archeological Consulting, Inc." Grossman directed his attorney to send the letter because he felt it was critically important for the THC to be aware of "the recent discovery of the Apache peace camp that stood opposite Paso del Norte in Duranguito and the immediate surrounding area."

By a letter dated September 3, 2019, Grossman's attorney provided the following reasoning for its request of a revision of the planned survey for the Arena project:

---

[13] In a pointed critique of Moore Consulting's research and reliance on Sonnichsen as a source, Dr. Romo testified it did not appear to him that they understood that Mescalero and Natagé are the same thing. Dr. Romo testified, "Natagé is the N'de word, the indigenous word, for Mescalero." He asserted, "[t]he biggest failing of that is the lack of any primary research. . . . I didn't see that they went to look at the archives of the Provincias Internas, which are in Mexico City. They did not go to see the Santa Fe records in Santa Fe, the state records of New Mexico. I didn't even see that they came here to El Paso to look at the Juarez archival collection."

Mr. Santiago's book is enormously significant for the history of El Paso because it has established for the first time that there was a large Mescalero Apache peace camp on the north bank of the Rio Grande, directly opposite Paso del Norte (now called Ciudad Juárez).

. . .

The significance of Duranguito being located within the Peace Establishment created by the Spanish cannot be overstated because most of the area that was within the Peace Establishment has since been developed into downtown El Paso. Duranguito is the only place in downtown El Paso where the type of archeological excavations necessary for locating and investigating the Peace Establishment can still take place.

. . .

The archival research conducted by Moore to develop its Research Design does not reference or take into account the research performed by Mr. Santiago because his book had not yet been published. Further, Moore apparently did not know of Mr. Santiago's work that had been completed at the time the Research Design was prepared.

With the letter, Grossman provided declarations of support from other area scholars. The group included Drs. Romo, Babcock, and Carmichael. Despite sending this letter, Grossman acknowledged the THC did not respond with a requirement for the City to modify the scope of work.

In seeking a temporary injunction, Grossman also presented deposition testimony of Douglas Mangum, the principal investigator of the City's survey and staff member of Moore Consulting. Mangum described that Moore Consulting was generally hired to perform salvage for hire or compliance archeology. Mangum testified he contributed to the survey preparation along with other senior staff members of the firm.

With regard to the survey of the project, Mangum described it was planned with the historic period of occupation beginning "[r]oughly around 1821 or so when Ponce de Leon got his first grant." The survey also included a map showing the location of the Rio Grande at various points in time. Research had shown that the area experienced flooding after 1827 which caused the river

48

channel to move at least twice in the 19th century, occurring in 1852 and 1896. Mangum added, "[r]ivers move because they either cut new channels or because they shift to an older channel because of a flood." With each move, the river channel moved farther away from the modern-day location of the city. Consequently, the location of Duranguito, as best he could tell, would now be close to the river channel of 1827. However, he noted the 1827 channel "might not have been buried very deeply."

When asked the depth of the planned excavation for the survey, Mangum responded he had planned for "[w]hatever depth is necessary to reach the—however deep the actual excavations from the construction will occur." He added, "[t]ypically, not always, but typically, we are only investigating the -- to the depth of impact." Even still, Mangum asserted he had prepared the scope of work recognizing "there was potential for Apaches in the area . . . ." As cited by the scope of work, Mangum relied on books authored by Sonnichsen and Newcomb describing that "Mescalero, Natagé and Gila bands were present in the area." After skimming Santiago's book with regard to the existence of the Mescalero Apache peace camp in the area, Mangum asserted, "the scope of work and the research design that we have already written already encompasses the potentiality of such finds." From his point of view, the THC had not requested anything specific to encounter the peace camp and he saw no need for changes. He testified, "[w]e are never required to know precisely every single historic or prehistoric European or Native American cultural resource that we might encounter, but we are required to be prepared for any such find, regardless of whether we knew the specifics of what type or not."

To counter these points, Grossman next presented testimony of Dr. Carmichael, a professor who teaches on subjects including Native American history, archeological methods, and critical thinking. Dr. Carmichael focused heavily on the archeological history of Native Americans, his

research concentration. He described that the City's downtown project presented a unique opportunity to conduct an archeological survey of the peace camp because of the size of the concentration of the Apache settlement, and the number of features that would likely be found. Dr. Carmichael further explained that a peace camp with a large size population means it would be easier to find materials.

Specifically, he described:

But when you have an opportunity where you've had, say, 6- or 800 people living for 20 years, intensively maybe for four or five of those years, the chances go up exponentially that you actually will be able to encounter some of those remains that we really haven't been able to discover in this region. Other parts of the Southwest have had greater success because the Apache groups in other parts of the Southwest tend to make -- they make more pottery than the Mescaleros did, and pottery is very preservable. And it's much more observable than what you would expect in a Mescalero site.

As an archeologist, Dr. Carmichael critiqued the survey's scope of work, in its present form, on a number of points. Focusing on the need to include input from local scholars, he described: "The first thing I would do, of course, is look up the regional literature for the region that's relevant to what we believe to be there. And the important part of that is contacting local scholars who are already working in that region or contractors who have done projects there." Next, he advocated for a systemic approach: "[t]he concern is, when you start looking for something that's below the surface, has no surface indication of where it might be, then you can't just hunt and peck. You have to produce some kind of systematic scheme for where you're going to test; otherwise, it's very hit or miss."

Dr. Carmichael pointed out that Moore's plan to excavate only to the depth of the project's construction was inadequate for achieving the goal of locating the peace camp. "But to plan to go only as deep as the construction is, I don't know what that means. In some places the construction's only going to be a sidewalk. Some places it might be a basement. . . . I think the preparation has

to be for it to be potentially deep." Finally, in relation to Santiago's confirmation of a Mescalero Apache peace camp, Dr. Carmichael described, "the historical research that's been done looks very solid. And that is certainly the best guess that we have, the best estimate that we have of where this thing should be."

In sum, witnesses testifying in support of the temporary injunction agreed that Santiago's book was well-researched, groundbreaking even, and deserved treatment as an important reference informing the cultural history of the area as required for survey work. The historians testified it was important to take this moment to study this peace camp and see what could be found. Together, the witnesses opined that the City's scope of work, as currently drafted, was not adequate to effectively locate, protect, and preserve the Mescalero Apache artifacts that were likely buried in the area of the project.

To be clear, Mangum testified he had no dispute with complying with the THC's request to become familiar with Santiago's book. Given the THC had not otherwise demanded changes, however, none had been made. Although he acknowledged the scope of work only mentions the Mescalero Apaches in one sentence and fails to include a systematic plan to determine whether those remains can be found, he asserted his firm remains aware "they were potentially there." On that score, he testified, "[s]o our coverage of how we will deal with Native American remains includes that." After being pressed for whether the survey included a plan to search for and recover Mescalero Apache remains from the peace camp area, he responded, "[i]t contains specific plans for how we will deal with Native American remains. And the THC, in their letter reinstating our permit, did not require us to be specific, just to be aware of and be mindful of that potentiality." Mangum conceded, "[w]e do not mention the peace camps because the peace camps were not something we were aware of because Mr. Santiago had not yet written or at least not yet published

his book, but we do discuss the potential for Mescalero Apaches being in the area and how we will address any Native American remains that we find, including Mescaleros."

### 4. Analysis

Given no factual dispute over the relative significance of the newly discovered research in confirming the possible existence of a historic peace camp in the area of the project's footprint, we hold that Grossman met his burden to establish a probable right to the relief sought pending a trial on the merits. Plainly, there is no factual dispute between the parties with regard to the City's survey—in its present form—in that it omits a plan to locate, protect, and preserve the historic Mescalero Apache peace camp, whose existence was known and confirmed *only after* submission of the survey to the THC. Even when viewing the record in a light favorable to the trial court's ruling, the evidence tends to establish the City is threatening to knowingly proceed with an investigation that does not comply with the administrative rules of the THC and related provisions of the Code. *See* 13 TEX. ADMIN. CODE § 26.18(a) and (b); s*ee also* TEX. NAT. RES. CODE ANN. § 191.055; *Cook*, 385 S.W.3d at 600; *San Miguel v. City of Windcrest*, 40 S.W.3d 104, 107 (Tex. App.—San Antonio 2000, no pet.); *Priest v. Texas Animal Health Com'n*, 780 S.W.2d 874, 876 (Tex. App.—Dallas 1989, no writ). Thus, we find the trial court clearly abused its discretion by misapplying the law to the established facts in this case.

Specifically, section 26.13 of the administrative rules requires that "[i]nvestigations undertaken on publicly owned cultural resources or to locate or discover such resources must be oriented toward solving a particular research problem . . . or for the purpose of salvaging information and specimens from a site threatened with immediate destruction." *See* 13 TEX. ADMIN. CODE § 26.13(a). Yet, here, the City does not contest or refute that the survey was prepared prior to the publication of Santiago's book. Nor does it contest the significance of that research in

identifying archived documents that confirm the existence of a relatively large, historic peace camp in the area of the project's footprint. *See* TEX. NAT. RES. CODE ANN § 191.002 (protected sites include historical American Indian or aboriginal campsites, dwellings, and habitation sites); *see also* 13 TEX. ADMIN. CODE § 26.3(5)(B) (for purposes of the Code, an archeological site is defined to include Native American open campsites which were occupied on a temporary, seasonal, or intermittent basis).

Given the post-submission timing of the book's publication, the survey in its current form does not account for the likely presence of the peace camp or the archeological items related to it. As section 26.13 provides, the research design of a survey investigation is "essential to the success of scientific objectives, resource management decision-making, and project management." *See id*. § 26.13(d). And without modification of the original design and work plan, the survey lacks planning to ensure that adequate funds, personnel, equipment, and facilities are utilized for this objective. *See id*. § 26.13(c)(1)-(7). The City acknowledges it has made no specific decisions oriented to the study of the newly discovered Mescalero Apache peace camp, nor otherwise planned for the recovery of the maximum amount of objects related thereto. *See* TEX. NAT. RES. CODE ANN. § 191.055.

Relying solely on the response from the THC, the City asserts it will keep a look out for Apache remains, but otherwise, it sees no need to make changes to the previously submitted work plan. We see two problems with such a response. First, by failing to modify the research design and related scope of work, the City fails to link the investigative study to relevant data brought to light by Santiago's work. *Id*. § 26.13(d)(3)(A). And, as required by section 26.13, research designs are not conceived as rigid, unchanging plans. *Id*. § 26.13(d)(4). Rather, THC rules provide that effort should be made to modify designs to exploit new information efficiently. *Id*. And,

recognizing that a survey must be carried out under the general supervision of the THC, all proposed changes in terms and conditions must be approved by the THC. *Id.* § 26.14(i).

Second, even if the City follows through with its promise to keep a look out for the peace camp while on site, that promise remains outside the terms and conditions of the issued permit. The record shows, then, that the City plans on carrying out an investigation not entirely under the general supervision of the THC, not in accordance with the applicable rules of the THC, nor in such manner as to account for recovering and preserving the maximum amount of historic, scientific, archeological and educational information that may be recovered from an investigation of the subsurface area of the arena footprint. *See* TEX. NAT. RES. CODE ANN. § 191.055. Either way, we conclude the City's response does not comport with the requirements of the Code nor of the adopted rules of the THC.

Even still, the City asserts two further arguments. First, that Moore Consulting's original research design and scope of work in fact recognized the potential for Native American artifacts, and thus, the survey provides for the location, protection, and preservation of Mescalero Apache artifacts. And second, that Grossman himself has already raised his concerns with the THC and it determined that no additional action was necessary. The City argues the THC's response precludes any obligation on the City to modify the original plan. As to both arguments, we disagree.

It is the implementation of what is written, the actual performance of the terms and conditions of the permit in accordance with the submitted work plan, that may or may not result in locating, protecting, and preserving the desired artifacts. By terms of the statute, the archeological permit operates as a contract setting forth the conditions to reasonably effect the purpose of the chapter. *See* TEX. NAT. RES. CODE ANN. § 191.052. And all operations must be carried out under the supervision of the THC in accordance with rules adopted by the THC. *See*

*id*. § 191.055. Thus, neither the City nor the THC, for that matter, can overlook the adopted rules of the agency. Even though the City now states it will look for peace camp items while on site, that assurance, while satisfying, falls outside contract terms.

And section 26.18 imposes an obligation on permittees not to encourage investigations on public lands without a "properly issued permit." 13 TEX. ADMIN. CODE § 26.18(c). Indeed, the statute expressly warns, "[s]uch investigations proceeding with the knowledge of the project sponsor and/or permittee constitute a violation of the Antiquities Code of Texas." *Id*. § 26.18(c). And to be properly issued, a permit must follow all pertinent requirements. *Cf. Amex Properties,* 602 S.W.3d at 532. To that extent, it follows that a properly issued permit must include all terms and conditions of the survey work.

What is most critical, at this juncture, is not whether the City failed to research adequately, but rather, whether the City complied with Code requirements after it learned of the new research discovering the existence of a Mescalero Apache peace camp in the project area. The THC rules require the research design to remain flexible such that it may be modified as important information develops. Yet, the City, in this instance, has refused to formally modify its survey and the THC likewise has not asked for such modification. Even so, the THC must comply with its own rules particularly given that the Code requires that operations must be carried out in accordance with those rules. *See* TEX. NAT. RES. CODE ANN. § 191.055; *see also Cadena Comercial USA Corp.*, 518 S.W.3d at 325. On this record, sufficient evidence was presented tending to show a probable violation of the Antiquities Code, and related rules of the THC, to support a temporary injunction to maintain the status quo until a final trial on the merits.

Because the state's interest in locating, protecting, and preserving a historic Mescalero Apache peace camp is threatened by the City's use of a scope of work that admittedly fails to link

with a desired research object, and fails to include all terms and conditions of the work planned on site, we conclude that temporary injunctive relief is appropriate to preserve the status quo pending a trial on the merits. *See id.* § 26.13(d)(3)(A). Had the City contested the likely presence of a Mescalero Apache peace camp in the project footprint, the obligation to revise the scope of work to account for that existence would be far less compelling. But we disagree with the City's position that it can operate with an admittedly incomplete survey that clearly omits any planning for the historic peace camp, yet decide, while on site, how it will thereafter proceed to locate, protect, and preserve, the potential artifacts of that particular research target.

To effectuate the state's interest, investigations or recovery operations must be carried out with adequate supervision by the THC, in accordance with the adopted rules, and in such manner that the maximum amount of historic, scientific, archeological, and educational information may be recovered and preserved. *See* TEX. NAT. RES. CODE ANN. § 191.055. And by the plain terms of the Code, the THC must issue an appropriate permit which provides for the termination of any right in the investigator or permittee on the violation of any terms of the permit. *See id.* § 191.054(c). If proper terms are not incorporated into a revised scope of work, followed by an amended permit, it then follows that the THC would be unable to adequately supervise or enforce violations of permit terms.

Even when viewing the evidence in the light most favorable to the trial court's findings, we hold the trial court abused its discretion in denying the request for a temporary injunction. *See Butnaru*, 84 S.W.3d at 204; *Walker*, 827 S.W.2d at 840; *Cook*, 385 S.W.3d at 607. Given the Code requires an "appropriate permit," and no factual dispute exists over the relevance of the discovery of the historic Mescalero Apache peace camp, we conclude the trial court erred in denying injunctive relief to preserve the status quo pending a trial on the merits. The City essentially

56

concedes that the newly discovered research merits consideration as the City promises to keep a look out while otherwise on site. To comply with THC supervision, however, an appropriate permit must contain all terms and conditions suitable to the planned investigation.

### 5. Relief

Based on the new research, Grossman argues the opportunity to explore the archeology of the peace camp will be forever lost if the City proceeds with a survey that is not designed to locate, protect, and preserve the remains of the peace camp. Preservation of the status quo is needed to ensure the project will proceed under the required supervision of the THC. Section 26.18 obligates the City—as a permittee—not to proceed with an investigation without receiving an appropriate permit from the THC. *See* 13 TEX. ADMIN. CODE § 26.18. And the THC is authorized to issue permit amendments, when appropriate, based on proposed changes in terms. *See id*. § 26.14(i).

Based on the record provided, we conclude the trial court abused its discretion as Grossman established entitlement to temporary injunctive relief to preserve the status quo pending trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Status quo is defined as the last peaceable time before the controversy. *See Sw. Bell Tel. Co.,* 526 S.W.2d at 528. Here, the time before submission of a permit application reflects the last peaceable time before the controversy. Thus, preservation of the status quo requires no commencement of the project, nor demolition of the buildings, until a trial on the merits of Grossman's statutory claim asserting the City's survey, as currently formed, violates or threatens to violate provisions of the Code. *See* TEX. NAT. RES. CODE ANN § 191.0525(b).

Accordingly, we sustain Grossman's sole issue.

## V. CONCLUSION

We affirm the denial of the plea to the jurisdiction. Additionally, because we conclude the trial court abused its discretion in denying the temporary injunction, we reverse the trial court's order denying injunctive relief and remand this cause to the trial court with instructions that it grant Grossman's request for a temporary injunction in furtherance of proceedings consistent with this opinion.

GINA M. PALAFOX, Justice

November 10, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.
Alley, J., dissenting